## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE: | ) | CASE NO.      08-33568 (LMW) |
| | ) | |
| STEPHANIE A. BERNSTEIN, | ) | CHAPTER      7 |
| | ) | |
| DEBTOR. | ) | |

- - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| EDWARD MALICKI, JR., | ) | ADV. PRO. NO.   09-3048 |
| | ) | |
| PLAINTIFF | ) | ECF NOS.      1, 8 |
| vs. | ) | |
| | ) | |
| STEPHANIE A. BERNSTEIN, | ) | |
| | ) | |
| DEFENDANT. | ) | |

- - - - - - - - - - - - - - - - - - - - - - - - -

### APPEARANCES

Gregory F. Arcaro, Esq.                    Attorney for the Plaintiff
Brown, Paindiris & Scott, LLP
2252 Main Street
Glastonbury, CT 06033


Kenneth E. Lenz, Esq.                    Attorney for the Defendant
The Lenz Law Firm, LLC
236 Boston Post Road, 2nd Floor
P.O. Box 965
Orange, CT 06477-0965


### MEMORANDUM OF DECISION


Lorraine Murphy Weil, Chief United States Bankruptcy Judge


Before the court is (a) the above-referenced plaintiff's ("Mr. Malicki") complaint (ECF No. 1

(as deemed amended pursuant to part III.A.1, *infra*), the "Amended Complaint")[1] seeking denial of the

---

[1]      References herein to the docket of this adversary proceeding appear in the following
form: "ECF No. __." References herein to the docket of this chapter 7 case appear in the following
form: "Case ECF No. __."

above-referenced debtor/defendant's (the "Debtor") chapter 7 discharge pursuant to 11 U.S.C.

§§ 727(a)(2)(B) and/or 727(a)(4)(A) and (b) the Debtor's counterclaim (set forth in ECF No. 8, the

"Counterclaim") against Mr. Malicki pursuant to 11 U.S.C. § 362(k) for damages allegedly incurred

by the Debtor as a result of Mr. Malicki's alleged "willful violation[s]" of the automatic stay in this

case. This court has jurisdiction over this proceeding as a core proceeding under 28 U.S.C. §§ 157(b)

and 1334(b) and that certain Order dated September 21, 1984 of this District (Daly, C.J.).[2] This

memorandum constitutes the findings of fact and conclusion of law required by Rule 7052 of the

Federal Rules of Bankruptcy Procedure.

## I.      BACKGROUND (ADVERSARY PROCEEDING)[3]

Mr. Malicki  commenced this adversary proceeding by filing the original complaint (*see* ECF

No. 1, the "Complaint") on June 19, 2009. The Complaint asserts that the Debtor should be denied her

chapter 7 discharge under Bankruptcy Code §§ 727(a)(2)(A)[4] and/or 727(a)(4)(A) based upon the

following allegations. First, the Debtor, with intent to hinder, delay, or defraud a creditor, concealed

her limited interest (the "Debtor Interest" as further defined below) in certain real property (the "Family

Property") located in Middletown, Connecticut (all allegedly within the purview of Bankruptcy Code

§ 727(a)(2)(A)). Second, the Debtor knowingly and fraudulently made false oath(s) in this case by

failing to disclose the Debtor Interest on her sworn bankruptcy schedules and in her testimony during

the examination (the "Examination") under oath at the Bankruptcy Code § 341meeting of creditors in

---

[2]      That order referred to the "Bankruptcy Judges for this District" *inter alia* "all
proceedings arising under Title 11, U.S.C., or arising in . . . a case under Title 11, U.S.C. . . . ."

[3]      Background respecting the underlying title 11 case is set forth in part II, below.

[4]      But see part III.A.1, *infra* (analyzing the Complaint under Section 727(a)(2)(B) rather
than Section 727(a)(2)(A)).

the chapter 7 case (the "Meeting of Creditors") (all allegedly within the purview of Bankruptcy Code § 727(a)(4)(A)).

On July 22, 2009, the Debtor filed her Answer and Counterclaim. (*See* ECF No. 8.) The Counterclaim seeks actual damages, attorneys' fees and punitive damages against Mr. Malicki pursuant to Bankruptcy Code § 362(k). The Counterclaim alleges that Mr. Malicki willfully violated the automatic stay by a prohibited postpetition telephone call (the "Malicki Telephone Call") to the Debtor on or about March 6, 2009 and/or a later improper visit (the "Malicki Visit") to the Family Property on or about July 12, 2009 and a conversation with the Debtor's father which occurred during that visit.[5]

An evidentiary trial (the "Trial") on the Complaint and the Counterclaim was held over two days: May 10, 2010 and May 19, 2010.[6] At the Trial, Mr. Malicki, Alan Bernstein (the Debtor's father, "Father"), the Debtor and the chapter 7 trustee (the "Chapter 7 Trustee") testified and both sides placed documentary evidence into the record.[7] At the conclusion of the Trial, the court took the matter under advisement, subject to post-trial briefing. Post-trial briefing has been completed and the proceeding now is ripe for the adjudication set forth below.

---

[5]    Mr. Malicki did not file an answer to the Counterclaim. However, the Debtor does not assert that Mr. Malicki has admitted the allegations of the Counterclaim as a consequence of such default. Accordingly, the court will not charge Mr. Malicki with any such admission(s).

[6]    A transcript of the May 10, 2010 proceedings appears in the record as ECF No. 28. A transcript of the May 19, 2010 proceedings appears in the record as ECF No. 30.

[7]    References to those exhibits appear herein in the following form: "Malicki Exh. __" or "Debtor Exh. __" (as the case may be).

## II.    FACTS

### A.    Complaint

#### 1.    Relevant Events Through the Filing of the Petition

The Debtor appears to be a woman in her early forties. The Debtor is a single mother with seven children (all of whom live with her). As of the commencement of the title 11 case, the ages of the Debtor's children were 15½ , 14, 12, 11, 5, 3 and 2 years. (*See* Case ECF No. 24 (Schedule I).) The Debtor became divorced from her second husband ("Husband") about two months prior to the Trial after an estrangement of about three and one-half years. (*See* ECF No. 28 at 149-51 (Debtor's testimony).) The Debtor is a law school graduate who was admitted to practice as an attorney in 1992. (*See id.* at 124 (Debtor's testimony).) However, until recently the Debtor had practiced law only for a brief period when she was pregnant with her first child. (*See id.* at 154 (Debtor's testimony).)[8]

Father acquired the Family Property about thirty-two years prior to the Trial for $85,000.00. (*See* ECF No. 28 at 81 (Father's testimony).) The Family Property is undeveloped (and, Father testified, essentially undevelopable) land comprising about one hundred twenty-two acres. (*See id.* at 81, 106-07 (Father's testimony).) The Family Property completely surrounds the property where Father's own home is located and gives it privacy. (*See id.* at 83-84 (Father's testimony).) Father always considered the Family Property as "family" property, intended that it be kept as a nature "preserve" and was emotionally attached to the Family Property. (*See id.* at 90-92 (Father's testimony).)

Through a series of six quitclaim deeds (the "Deeds") executed at the rate of one per year commencing in 1992, Father transferred his entire interest in the Family Property to the Debtor and her two siblings as tenants in common (collectively, the "Grantees"). (*See* Malicki Exhs. V, W, X, Y, Z

---

[8]    Recently, the Debtor has made some efforts to revive her practice. (*See* ECF No. 30 at 42-43 (Debtor's testimony).)

and AA.)[9]  Each of the Deeds was recorded on the land records (*see* Debtor Exh. 8), but Father never

gave the Grantees copies of the Deeds (*see* ECF No. 28 at 102 (Father's testimony)).   The idea to

transfer the Family Property to the Grantees originated with Father; the Grantees did not request the

transfer.  (*See id.* at 102-03 (Father's testimony).)  Even after Father had no record interest in the Family

Property, Father continued to pay the taxes on the Family Property.  (*See id.* at 105-06 (Father's

testimony).)  The Debtor did not receive tax bills for the Family Property, maintain it or the like.  (*See

id.* at 157-59 (Debtor's testimony).)

At around the time of execution and recording of the first Deed, Father had a lawyer draw up

an agreement (Malicki Exh. E, the "Family Property Agreement") among himself[10] and the Grantees

to govern control over the Family Property.   Among other things, the Family Property Agreement

required unanimous consent of the tenants in common to transfer outside of the family, or to encumber,

the Family Property (or any portion thereof).  (*See* ECF No. 28 at 94 (Father's testimony).)  Father did

not record the Family Property Agreement on the land records, nor did he give the Grantees a copy nor

(except as noted below) did he ever take the Family Property Agreement out again to show the

Grantees.  (*See id.* at 104-05 (Father's testimony).)  In fact, Father himself misplaced the Family

Property Agreement and did not locate it until about one or two months after his January 22, 2010

deposition in this proceeding.  (*See id.* at 105 (Father's testimony).)  At that time, Father gave the

Family Property Agreement to the Debtor.  (*See id.*)

---

[9]     The transfer was so structured in order to avoid gift tax consequences.  (*See* ECF No.
28 at 102 (Father's testimony).)  The Debtor's interest in the Family Property as tenant in common
hereafter is referred to as the "Debtor Interest."

[10]     Father retained a record interest in the Family Property until his remaining interest had
been conveyed pursuant to the final Deed.

After the Debtor's second marriage, in 2004 she embarked on a real estate business (the "Business") with Husband. The nature of the business was to acquire, renovate and sell (presumably for a profit) improved real estate (including the Clinton Property (as hereafter defined), collectively, "Investment Properties"). The Business really was Husband's, but (with one exception) the Investment Properties were acquired and financed in the Debtor's name because her credit was better than Husband's. (*See* ECF No. 28 at 124-26, 160 (Debtor's testimony).) Initially, the Debtor was able to finance the properties with mortgage loans from commercial banks. (*See id.* at 161, 164 (Debtor's testimony).) However, acquisition of one Investment Property was financed with a mortgage on the Debtor's home (the "Home") which she obtained in her first divorce. (*See id.* at 161 (Debtor's testimony).) Moreover, Father also bought an Investment Property for the Business in his name in Clinton (the "Clinton Property"). (*See id.* at 163 (Debtor's testimony).)[11]

The Business did not prosper. Investment Properties either were sold at a loss or went into foreclosure. (*See* ECF No. 28 at 161-65 (Debtor's testimony).) The Debtor took out another mortgage on the Home to try to keep the Business afloat until one or more Investment Properties could be sold at a profit. (*See* ECF No. 28 at 167-68 (Debtor's testimony).) Father took out personal loans for the same purpose. (*See id.* at 168 (Debtor's testimony).) Father also co-signed or guaranteed mortgage loans for the Debtor to enable her to acquire for the Business certain Investment Properties in Madison. (*See* ECF No. 28 at 109-10 (Father's testimony).) Certain mortgages as to which Father was personally liable went into foreclosure, and demand was made upon Father. (*See id.* at 110-11 (Father's testimony).) Father also lent money directly to the Debtor. (*See id.* at 110 (Father's testimony).) As of the commencement of this title 11 case, the Debtor owed Father about $750,000.00. (*See id.*)

---

[11]   That Investment Property ultimately was sold for no profit in a "short sale." (*See id.* at 178 (Debtor's testimony).)

Finally, the Debtor had to resort to "hard money lenders" who would lend into troubled situations on more onerous terms than those ordinarily required by commercial lenders. (*See* ECF No. 28 at 168 (Debtor's testimony).) The Debtor knew a mortgage broker by the name of Dennis Ermsher. (*See id.* at 169 (Debtor's testimony).) Mr. Ermsher led the Debtor to three "hard money" lenders. (*See id.* at 170-177 (Debtor's testimony).) Two of those lenders merit further discussion.

Mr. Ermsher arranged for the Debtor to obtain a loan from Mr. Malicki evidenced by a "Commercial Promissory Note" dated October 30, 2007 and in the original principal amount of $70,000.00. (*See* Debtor Exh. 10.) That note was payable in full on December 4, 2007. (*See id.*) The loan was secured by a mortgage on the Home. (*See* ECF No. 28 at 17, 19 (Mr. Malicki's testimony).) The Debtor was depending on the sale of an Investment Property to pay that note when due. (*See id.* at 171 (Debtor's testimony).) When no such sale occurred, Mr. Ermsher arranged another loan from Mr. Malicki. (*See id.* at 172 (Debtor's testimony).) The Debtor executed and delivered to Mr. Malicki a note dated January 17, 2008 in the amount of $244,505.30, which note was payable in full on July 17, 2008. (*See* Malicki Exh. II.) That loan was secured by mortgages on two of the Investment Properties and on the Home. (*See* ECF No. 28 at 21 (Mr. Malicki's testimony).)[12]

Mr. Ermsher also arranged for the Debtor to obtain a loan from New England Home Buyers, LLC ("Home Buyers") of which a certain Paul Kaplan was principal. (*See* ECF No. 28 at 175-76, 202 (Debtor's testimony).)[13] Negotiations with Mr. Kaplan took place some time before March 19, 2008.

---

[12]    However, Mr. Malicki also testified at the Trial that there were two loans (rather than one loan) prior to the January 17, 2008 loan, that the total of those two earlier loans was about $200,000.00 and that the January 17, 2008 loan was a "rewrite" of those two earlier loans. (*See id.* at 6, 23-24 (Mr. Malicki's testimony).)

[13]    "Kaplan" is rendered "Caplin" in the transcript(s) of the Trial. However, in her bankruptcy matrix and schedules the Debtor used the spelling "Kaplan" (*see, e.g.,* Case ECF No. 1). Accordingly, the court has used that spelling herein.

(*Cf.* Debtor Exh. 8).)  The Debtor asked Mr. Kaplan for credit on an unsecured basis.  However, Mr. Kaplan said that, for any loan, the loan had to be collateralized and that he had to be a senior secured creditor with respect to at least one piece of collateral for the loan.  (*See* ECF No. 28 at 175 (Debtor's testimony).)  The Debtor could not offer Mr. Kaplan a senior position on any Investment Property or on the Home.  (*See id.*)  However, the Debtor responded to Mr. Kaplan as follows:

> I said the only thing that I have that I don't believe has a mortgage on it is something I have with my brother and sister and I don't know if there's much value in it and he came through Dennis Ermsher and said that -- and we had had a conversation as well and he said he liked to do a deal with me and basically, I'll do you a favor, I don't think there's much value in there.  He had spoken to the developer or the planning and zoning department but he said because he'd be in first position even though it was owned jointly with my brother and sister, he would do it.  And I was comfortable doing that at the time . . . .

> [W]e had switched another realtor, who said that she had -- or he -- I think it was a she -- had an imminent buyer and so I really --  really felt that this would just be a short term thing that would be paid off in a month and just keeping the mortgages current -- or a couple months . . . .

(*Id.* at 175:10-176:12 (Debtor's testimony).)  Accordingly, on or about March 19, 2008, the Debtor entered into a loan (the "Kaplan/Home Buyers Loan") in the amount of $50,000.00 with Home Buyers which loan was secured by a mortgage on the Debtor Interest (the "Kaplan/Home Buyers Mortgage"). (*See* Debtor Exh. 8.)  That mortgage was recorded on the Middletown land records.  (*See id.*)[14]  The Debtor did not give Father prior notice of the Kaplan/Home Buyers Mortgage.  In fact, Father did not learn about the Kaplan/Home Buyers Mortgage until a few months before his January 22, 2010 deposition; he was upset when he did learn about that mortgage.  (*See* Case ECF No. 28 at 96 (Father's testimony).)

---

[14]    There was an additional "hard money" loan from a Jane Cyprus-Wright but the Debtor is uncertain as to its date.  (*See id.* at 177 (Debtor's testimony).)  That loan is scheduled in this title 11 case as an unsecured debt in the amount of $116,550.00.  (*See* Case ECF No. 24 (Schedule F) ("[p]ersonal loan and unrecorded mortgage").)

The Home went into foreclosure and a "law date" was set for either November 1, 2008 or November 2, 2008. (*See* ECF No. 28 at 180 (Debtor's testimony).) At around that time, the Debtor lived in the Home with her children and her elderly mother. (*See id.*) The Debtor "didn't know what to do, where [they] . . . were going to go, so . . . [she] obviously was trying to buy some time so . . . [they] could figure out where to go." (*Id.* at 180:18-21 (Debtor's testimony).) Accordingly, the Debtor vacated the "law date" by filing a petition under chapter 13 of the Bankruptcy Code (*see* Case ECF No. 1, the "Petition") on October 31, 2008.

## 2.     Relevant Postpetition Events

The Debtor did not file schedules with the Petition. (*See* Case ECF No. 1.) The Debtor was not in a position to file her schedules and other documents with the Petition because she was having serious medical problems (*see* ECF No. 30 (Debtor's testimony)), was separated from Husband (*see id.*), and was "dealing with all of this and an infant and six children by . . . [herself], and panicking about what to do with . . . [her] elderly mother, who also lived with . . . [her]. It was just . . . a nightmare." (ECF No. 30 at 11:14-18 (Debtor's testimony); *see also* ECF No. 28 at 179-80 (Debtor's testimony) (health issues).) However, on the mailing matrix filed with the Petition, the Debtor listed Mr. Kaplan as follows:

Paul Kaplan
Kaplan Enterprises
3030 Whitney Avenue
P. O. Box 185527
Hamden, CT 06518

, and made no reference to Home Buyers. (*See id.*)[15]  The original matrix also made no mention of

Father. (*See id.*)

Shortly after Mr. Malicki received notice of the commencement of this case, he telephoned the

Debtor. (*See* ECF No. 28 at 8 (Mr. Malicki's testimony).)[16]  Mr. Malicki testified at the Trial that the

Debtor told him during that call that "she had some property that wasn't in the bankruptcy that she's

been putting away that she would be able to pay me with that," (*id.* at 9:2-5 (Mr. Malicki's testimony)).

The Debtor denies making any such statement. (*See id.* at 198 (Debtor's testimony).)  The court is more

persuaded by the Debtor's testimony by than Mr. Malicki's testimony in that regard.

Around early December, 2008, the Debtor went to her bankruptcy attorney's office with all the

documents she could find to complete her schedules. (*See id.* at 181 (Debtor's testimony).)  She

brought her five youngest children with her to that appointment. (*Id.* at 182 (Debtor's testimony).)

"[S]he had come into . . . [her] attorney's office with a bag of all of . . . [her] debt and . . . [her]

mortgages and appraisals . . . .  [They] just went through the bag and . . . [they] listed properties and

assets and liabilities based on what was with . . . [her] in . . . [her] bag of what . . . [she] had received

in the mail." (*Id.* at 131:16-25 (Debtor's testimony).)  After that meeting, the Debtor filed her original

schedules (included in Case ECF No. 24, the "Original Schedules").

The Original Schedules listed four pieces of real property (*i.e.,* the Home and three Investment

Properties), but made no mention of either the Debtor Interest or the Family Property. (*See* Case ECF

---

[15]    The Debtor did not have a copy of the mortgage note or mortgage deed for the
Kaplan/Home Buyers Loan. (*See* ECF No. 28 at 204 (Debtor's testimony).)  Moreover, Mr. Kaplan had
sent the Debtor only relatively uninformative notices about the Kaplan/Home Buyers Loan. (*See id.*)
The Debtor explained: "I forgot it was a mortgage.  I knew it was a loan.  I was just going on
paperwork.  It was a not[ice] from Paul . . . [Kaplan], you know, what's going on with the money you
owe me and we so listed as [sic] a debt." (*Id.* at 203:9-13 (Debtor's testimony).)

[16]    That telephone call is discussed more fully in part II.B, *infra.*

No. 24 (Schedule A).)  The Original Schedules also made no mention of the Kaplan/Home Buyers

Mortgage.  (*See id.* (Schedule D).)  The Original Schedules also did not list Father as a creditor.  (*See*

*id.* (Schedules D and F).)  However, the Original Schedules listed an unsecured debt in the amount of

$50,000.00 to Paul Kaplan at "Kaplan Enterprises" for "money loaned."  (*See id.* (Schedule F).)[17]  The

Original Schedules listed secured debts in the aggregate amount of $7,638,737.00 of which

$2,382,853.00 was listed as undersecured (*i.e.,* unsecured).  (*See id.* (Schedule D).)  The Original

Schedules listed other unsecured debts ("Other Unsecured Debts") in the aggregate amount of

$2,378,840.00.  (*See id.* (Schedule F).)  The Debtor also filed amended Schedules B, C and G on

December 4, 2008.  (*See* Case ECF No. 27, the "First Amendment.")  The First Amendment is germaine

to the extent that it did not contain an amendment to Schedule A adding the Debtor Interest.  (*Cf. id.*)

A hearing on the court's motion to dismiss the case for missing schedules and the like had been

scheduled for December 4, 2008.  (*See* Case ECF Nos. 22, 23.)  The first meeting of creditors under

Bankruptcy Code § 341 was scheduled in the chapter 13 case for December 5, 2008.  (*See* Case ECF

No. 4.)  In light of the Debtor's filings on December 4, 2008 (*see* Case ECF Nos. 24, 25, 26 and 27),

the hearing on the motion to dismiss was marked "off" (*see* Case Docket entry for December 4, 2008).

The Bankruptcy Code § 341 meeting of creditors was marked "off" by the chapter 13 trustee.

(*See* Case Docket entry for December 9, 2008.)  Instead, apparently based on the Original Schedules

(as amended by the First Amendment), on December 9, 2008 the chapter 13 trustee filed a motion to

dismiss the case for the reason that the Debtor exceeded the debt limits for chapter 13 eligibility.  (*See*

Case ECF No. 33.)  *Cf.* 11 U.S.C. § 109(e).  On January 7, 2009, the Debtor filed a motion to convert

the chapter 13 case to a case under chapter 7 of the Bankruptcy Code.  (*See* Case ECF No. 41.)  The

---

[17]    The Original Schedules were inaccurate in other aspects (not relevant here) as well.  (*See, e.g.* ECF No. 28 at 184 (Debtor's testimony).)

hearing on the chapter 13 trustee's motion to dismiss was marked "off" (*see* Case Docket entry for January 12, 2009) and, on January 16, 2009, an order entered converting the case to a case under chapter 7 of the Bankruptcy Code (*see* Case ECF No. 43). The Chapter 7 Trustee was appointed and the Meeting of Creditors originally was scheduled for February 17, 2009. (*See* Case ECF No. 44.) The Meeting of Creditors subsequently was continued to and held on March 10, 2009 (*see* Case Docket entry on March 11, 2009).

On January 20, 2009, the Debtor filed an amended Schedule F. (*See* Case ECF No. 47, the "Second Amendment"). The Second Amendment added $748,995.80 in Other Unsecured Debts to the total stated in the Original Schedules (including a claim in the name of Father in the amount of $747,495.80). (*See id.*) The Second Amendment further is germaine in that it did not contain an amendment to Schedule A adding the Debtor Interest. (*Cf. id.*)

As noted above, the Meeting of Creditors was held on March 10, 2009. During the Examination by the Chapter 7 Trustee, the Debtor testified under oath that the Original Schedules (as amended effective as of that date) were "true and correct" (at least in relevant respects). (*See* Malicki Exh. J at 3 (Debtor's testimony).) At the conclusion of the Meeting of Creditors, the Chapter 7 Trustee filed a report that he had "concluded that there are no assets to administer for the benefit of creditors of this estate." (Case ECF No. 101.) On April 2, 2009, the Debtor filed further amendments to Schedules B and C. (*See* Case ECF No. 104, the "Third Amendment.") The Third Amendment is germaine in that it did not contain an amendment to Schedule A adding the Debtor Interest. (*Cf. id.*) The Original Schedules, as amended by the First, Second and Third Amendments hereafter are referred to as the "Schedules."

On May 18, 2009, the court issued an order permitting counsel for Mr. Malicki to examine the Debtor under oath pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, "with

attendance, and the production of documentary evidence, by agreement, or compelled in the manner provided in F.R. Bankr. P. 9016." (Case ECF No. 123.)  Subsequently, counsel for Mr. Malicki served a "Subpoena for Rule 2004 Examination" upon the Debtor.  (*See* Malicki Exh. KK, the "Rule 2004 Subpoena.")  The Rule 2004 Subpoena commanded the Debtor to appear for a Rule 2004 examination on May 22, 2009 (the "Rule 2004 Examination") and also commanded the Debtor to produce certain documents at the Rule 2004 Examination.  (*See id.*)  Among the documents listed on the Rule 2004 Subpoena was "any document relating to . . . [the Family P]roperty . . . ."  (*See id.* (Schedule A, item 9(d)).)[18]

The Debtor testified at the Trial that she had forgotten about the Debtor Interest until she saw the reference to the Family Property in the Rule 2004 Subpoena.  (*See* ECF No. 28 at 131 (Debtor's testimony); ECF No. 30 at 16-17 (Debtor's testimony).)  The Debtor then advised her bankruptcy counsel of her omission.  (*See* ECF No. 28 at 141 (Debtor's testimony).)  Counsel advised the Debtor to get as much information as possible about the Family Property, including evidence of value.  (*See* ECF No. 28 at 189 (Debtor's testimony).)  Such information would be required to prepare the Fourth Amendment (as hereafter defined).

The Rule 2004 Examination was convened as scheduled.  At the Rule 2004 Examination, the Debtor testified with respect to her failure to schedule the Debtor Interest in relevant part as follows:

> Q.     So you were of the opinion in October of 2008 that you no longer owned . . . [the Debtor Interest]?
>
> A.     That I no longer had any equity in it.  I know my name is still on it.  I don't think it is going to be mine very much longer.  I don't know.  I know that I mortgaged . . . [the Debtor Interest], and I haven't been able to keep up the mortgage.

---

[18]     Mr. Malicki had learned about the existence of the Family Property from Mr. Ermsher. (*See* ECF No. 28 at 9-10 (Mr. Malicki's testimony).)

Q.      So you based the decision not to list . . . [the Debtor Interest] on your bankruptcy schedules because you didn't think you had any equity in it?

A.      Yes.

Q.      Is that the only reason you chose not to put it on your bankruptcy schedules?

A.      Yes.

(Malicki Exh. MM at 90:7-20 (Debtor's testimony, the "Debtor's Rule 2004 Testimony").)

After the Rule 2004 Examination, the Debtor obtained a broker's opinion of value (a "BPO") dated May 27, 2009 from William Raveis with respect to the Family Property opining that the entire Family Property had a fair market value of $140,000.00 for reasons including the limited development potential of the property.  (*See* Debtor Exh. 7)[19]  On May 27, 2009, the Debtor e-mailed William Warner, Director of Planning, Conservation & Development for the City of Middletown, seeking his informal opinion about the development potential of the Family Property.  (*See* Malicki Exh. H, the "Warner E-Mail.")  Among other things, the Warner E-Mail contained the following statement by the Debtor:

> My belief has always been that the land has sentimental value to my dad and our family but no real value and at the time of the mortgage I was told that the land had little to no inherent value as developable land based on the town field cards.  As you know, the town placed the value of both lots below my mortgage of $50,000.00.  When I filed my bankruptcy it didn't even occur to me to list the land as an asset based on the facts that 1) it was mortgaged beyond what I believed the value to be 2) that I am a minority interest holder with my brother and sister having the other 2/3 interest, 3) that my belief based on other's experience in the past attempting to get building permits and houses put up on Shunpike and just my overall impression is that the land would be extremely difficult to develop and very costly, possibly making the lots that could be subdivided not cost effective as an investment and finally, 4) in this economy and this real estate market it didn't occur to me that my 1/3 undivided interest in the land would be

---

[19]      That value is not reduced to reflect the limited nature of the Debtor Interest nor to reflect the effect of the Kaplan/Home Buyers Mortgage on the Debtor Interest.  The Debtor also commissioned a second BPO, but it is not of record.

desirable and able to be partitioned off and sold for profit over the existing $50,000 mortgage existing on it.

(Malicki Exh. H at 2.)  Mr. Warner responded to the Debtor with a letter dated May 27, 2009 (the "Warner Letter") in which (among other things) he stated the following:  "Based on my review I can conclude that the development of the . . . [Family P]roperty . . . will be extremely difficult even in an extremely good real estate market."  (Debtor Exh. 5.)[20]

On May 28, 2009, the Debtor filed amended Schedules A and D.  (*See* Case ECF No. 130, the "Fourth Amendment.")  Amended Schedule A is germaine in that it scheduled the Debtor Interest (for the first time) with a stated value of $46,666.67, subject to a $50,000.00 encumbrance.  (*See* Case ECF No. 130 ("Schedule A - Real Property - Amended").)  Amended Schedule D is germaine in that it scheduled the claim of "Paul Kaplan [at] Kaplan Enterprises" as a claim secured by a mortgage on the Debtor Interest in the stated amount of $50,000.00 yielding an undersecured claim in the amount of $3,333.33.  (*See id.* (Schedule D - "Creditors Holding Secured Claims - Amended").)  Amended Schedule D did not refer to Home Buyers.  (*See id.*)  The net effect of Amended Schedule D was to (a) increase secured claims by $50,000.00, (b) increase undersecured claims by $3,333.33 and (c) decrease Other Unsecured Debts by $50,000.00.  Counsel for the Debtor also obtained a Limited Title Report (the "Title Report") dated June 5, 2009 with respect to the Family Property.  (*See* Debtor Exh. 8.)  In relevant part, the Title Report noted (a) the Deeds and (b) the Kaplan/Home Buyers Mortgage.  (*See id.*)

When the Chapter 7 Trustee saw the Fourth Amendment (listing the Debtor Interest), he called the Debtor's counsel.  (*See* ECF No. 30 at 69 (Chapter 7 Trustee's testimony).)  In connection with a letter dated June 10, 2009, counsel delivered to the Chapter 7 Trustee a copy of the Warner Letter, a copy of the William Raveis BPO, a copy of the Title Report and a copy of the Fourth Amendment.  (*See*

---

[20]       The basis for Mr. Warner's opinion is set forth in the letter.  (*See id.*)

Debtor Exh. 4; *see also* ECF No. 30 at 70-71 (Chapter 7 Trustee's testimony).)  Shortly thereafter, the

Chapter 7 Trustee was contacted by Mr. Malicki's bankruptcy counsel.  (*See id.* at 72 (Chapter 7

Trustee's testimony).)  The Chapter 7 Trustee advised Mr. Malicki's counsel that, in the Chapter 7

Trustee's opinion, the Debtor Interest did not have any value to the estate.  (*See id.*)  The Chapter 7

Trustee followed up that conversation with a confirmatory letter.  (*See* Debtor Exh 11.)  At the Trial,

the Chapter 7 Trustee stood by his opinion as to value and also gave his opinion that the Debtor should

be granted a discharge in this case.  (*See* ECF No. 30 at 75-76, 86-90 (Chapter 7 Trustee's testimony).)[21]

**B.**      **Counterclaim (Additional Facts)**

The Malicki Telephone Call and the Malicki Visit are discussed separately below.

**1.**      **The Malicki Telephone Call**

At the Trial, the Debtor testified in relevant part as follows with respect to the Malicki

Telephone Call:

> A.      [Mr. Malicki] . . . contacted me several times in that fall, in November
>          and --
>
> Q.      After you filed?
>
> A.      Yes.
>
> Q.      Okay.  Did you tell him in your conversations that you had already filed
> bankruptcy?
>
> A.      Yes.
>
> Q.      And what was his response to that?

---

[21]      The court has not relied upon the Chapter 7 Trustee's opinion as to the value to the estate
of the Debtor Interest, or the appropriateness of the Debtor's receiving a discharge, in reaching the
decision set forth below.  With respect to the actual value to the estate of the Debtor Interest, as
discussed below, that issue is irrelevant.  With respect to the Debtor's discharge, the court deems it
more appropriate for the court to make its own independent decision.  No disrespect to the Trustee is
intended or should be inferred.

A.      Well [sic] do you plan on doing about it and I said I'm [in] bankruptcy, I don't even know how this all works.  That was during that crazy, horrific time for me.  So the conversation were [sic] short.  I believe he called one time when I was so sick, I couldn't speak and I had laryngitis  and he, at that time, was actually very polite and said you sound really sick, I'll call you back another time.

Q.      Okay.  Did there come a time when he called you back when you no longer had laryngitis?

A.      Yes.

Q.      And when was that?

A.      In March of 2009.

Q.      Okay.  And what -- he called on your cell phone or your house phone or do you remember?

A.      I think he had left me messages on both phones so I don't know exactly where this conversation was but it was -- it -- I don't know which one it was.  I mean he had left messages on both, where he actually got me in March, I don't know.

Q.      Okay.  All right.  So at some point, you got on the phone in March of 2009, could you tell the court, what was the conversation, who said what to whom in that telephone conversation.

A.      Well, he was very hostile and angry and yelling and asked how I intended to pay him back if I was in bankruptcy.  And I said, I can't -- I'm so sorry.  This is not, obviously, what I expected or wanted and I'm losing everything too and I'm so sorry.  And he said I will not lose my pension, not to you or anybody.  I didn't work my whole life to lose my money to you.

And I said, again, I'm so sorry, you know, contact my attorney.  I'm sorry is what I just kept saying and then he started threatening me that he'll get his money by any means and I said don't threaten me.  You're scaring me now.  And he said it's not a threat, I will get my money.  And I said don't call me again and I hung up and I called you [*i.e.,* Debtor's counsel] immediately.

Q.      How did that call make you feel?

A.      Well, I was -- I was scared actually because he was very threatening and I was home alone with my seven children and it was -- I was scared.

Q.      So in response to that, you contacted me.  Is that correct?

- 17 -

A.   I contacted you and I contacted other people, too, because I was scared.

Q.   Okay.  Did you contact me immediately after the phone call from Mr. Malicki?

A.   Within seconds.

MR. LENZ:   May I have [Debtor's] Exhibit Number 3, please?

BY MR. LENZ:

Q.   I'm showing you now a letter, which is already in evidence, from me to Edward Malicki, which is dated March 12, 2009.  Did you receive a copy of that?

A.   Yes, I did.

Q.   And that references a phone call on March 6th, I believe.

A.   Yes.

Q.   Was that the date of your phone call?

A.   Yes, it was.

. . .

Q.   As a result of that conversation and the concerns that you expressed there, did you suffer any ill-effects afterwards, any physical effects?

A.   Well yeah, I lost more sleep than I had been losing and I was distraught and anxious.

Q.   Right.  Were you then under the care of a psychotherapist?

A.   Yes.

Q.   Okay.  Did you make another appointment to see the psychotherapist?

A.   Yes.

Q.   Was this stressor discussed with your psychotherapist?

A.   Yes.

(ECF No. 28 at 194:13-197:20, 198:13-199:3 (Debtor's testimony).  *Cf.* Debtor Exh. 3 (the "Lenz

Letter").)

Mr. Malicki denies that the Malicki Telephone Call ever took place.  (*See id.* at 36 (Mr.

Malicki's testimony).)  The court finds the Debtor's testimony about the occurrence and substance of

the Malicki Telephone Call to be more persuasive than Mr. Malicki's testimony.

      **2.**      **<u>The Malicki Visit</u>**

At the Trial, Father testified in relevant part as follows with respect to the Malicki Visit:

> Q.     Dr. Bernstein, at some point in time, a gentleman . . . came down where your house is located.  Correct?
>
> A.     Correct.
>
> Q.     All right.  And you observed this gentleman outside your window for a period of time, is that correct?
>
> A.     I noticed a truck that was parked on the -- on the road which was adjacent to my front lawn.  That --- and that's what I noticed and then I noticed a man walking around.
>
> Q.     Okay.  And after a period of time you went outside to address him, is that correct?
>
> A.     After approximately 15 or 20 minutes, I went out and I asked him if I could help him.
>
> Q.     Okay.  And this gentleman asked about the . . . [Family P]roperty, did he not?
>
> A.     He asked where Stephanie Bernstein's property is because he wanted to harvest trees. And he did it in a very hostile way.
>
> Q.     The entire conversation lasted about five minute [sic], is that correct?
>
> A.     Less.
>
> Q.     And you and this gentleman were never -- never closer than 20 yards from each other.  Is that a fair statement?

A.    Approximately.

Q.    Okay.  Dr. Bernstein, you were very upset about the idea of trees being cut down off the . . . [Family P]roperty, is that correct?

A.    Correct.

. . .

Q.    So when you saw Mr. Malicki not only -- strike that.

Last summer a gentleman in a pickup truck came down that long dirt road during the day and parked close to your house, is that right?

A.    Correct.

Q.    And that person got out of his pickup truck and walked around?

A.    Correct.

Q.    And that person in the court today?

A.    Correct.

Q.    Who is it?

A.    The gentleman sitting next to Mr. Arcaro.

MR. LENZ:    Would the record reflect he's identified Edward Malicki, Jr.

MR. ARCARO:  No objection.

THE COURT:  All right.  It's so recognized.

. . .

Q.    So after he -- after this -- Mr. Malicki was outside of his truck for a period of time, you went over to see him; is that correct?

A.    Correct.

Q.    He testified that he stayed in his truck.  Is that true?

A.    I think he was walking around the property.

. . .

- 20 -

Q.      Did it appear to you that Mr. Malicki was getting ready to leave or about to leave when you spoke to him?

A.      No.

Q.      In fact, if he had left you never would have gone out to talk to him, would you have?

A.      Correct.

Q.      So after he was there for about 15 minutes is when you went out to talk to Mr. Malicki?

A.      Correct.

Q.      And what did you say to him and what was his response to the best of your recollection?

A.      I said, May I help you?  And his response was I'm here to look at Stephanie Bernstein's property so that I could harvest trees.

(ECF No. 28 at 88:23-90:8, 114:19-118:7 (Father's testimony).)

At the Trial, Mr. Malicki testified in relevant part with respect to the Malicki Visit as follows:[22]

Q.      Okay.  At some point in time, did you visit the . . . [Family P]roperty?

A.      Yes.

Q.      And why did you visit the property?

A.      I wanted to look at it, see if there was any value to it, if something I could do with it.

Q.      Were you thinking about buying it?

A.      Yeah, that --  yes, that crossed my mind, yes.

Q.      Okay.  When you visited the . . . [Family P]roperty, did you speak to anyone?

---

[22]      Mr. Malicki is an experienced businessman, attended college (short of matriculation) and his brother (with whom he consulted on this matter) is an attorney.  (*See id* at 10, 29-30 (Mr. Malicki's testimony).)

A.       Yes.

Q.       Did that person introduce themselves?

A.       Not at the beginning, no.

Q.       Okay.  And how long did that -- withdrawn.

Did you later find out the person you met was . . . [F]ather?

A.       Yes.

Q.       Okay.  Is that person in the courtroom today?

A.       Yes.  It's that gentleman over there.

Q.       Okay.

MR. ARCARO:  And, your Honor, did the record reflect that . . . Mr. Malicki pointed to the person in the back of the room, who I believe is Stephanie Bernstein's father?

MR. LENZ:  Without objection.  The record can reflect that's . . . [Father].

BY MR. ARCARO:

Q.       How long did the --

THE COURT:  So ordered.

MR. ARCARO:  I'm sorry.

BY MR. ARCARO:

Q.       How long did the conversation last, Mr. Malicki?

A.       A few minutes.

Q.       And how close were you to . . . [Father] when you were speaking with him?

A.       Seventy -- 50, 75 feet.

Q.       And what took place during the conversation?

- 22 -

A.      I was -- I drove down to the end of the road where he lives, it's a dirt road, and I was looking around for the -- I had a map for the 120 acres that were supposed to be there.  And I had a tough time finding it, and I was driving out [sic] the road and [Father] come out and asked me what I was doing there.  And I told him I was looking for this property, there's supposed to 120 acres over here somewhere around that I was looking at.

And he asked me, you know, what -- why?  And I told him if, you know, he didn't know, this was a personal matter between . . . myself and someone else and I didn't want to discuss it with him.  And then he asked if it was . . . [the Debtor].  And I said, yes.  And that's when he told me . . . that he was her father.

Q.      Did . . . did you speak to . . . [Father] about trees on the property?

A.      Yes.

Q.      Okay.

A.      I said I was looking at the property, seeing if I could recoup some of my money . . . .

Q.      Did . . . [Father] become upset over your conversation?

A.      He got a little agitated.  Yes, he did.

Q.      Okay.  Did you threaten . . . [Father] in any way?

A.      No.

Q.      Did you raise your voice in anger in any way --

A.      No.

Q.      -- during this conversation?

A.      No.

. . .

Q.      Okay.  And when you went to visit . . . [the Family P]roperty, you drove there in your pick-up truck?

A.      Yes, I did.

Q.      And you drove down a long dirt road?

- 23 -

A.      Yes, I did.

Q.      And you eventually arrived at or near the home of . . . [Father]?

A.      Yes.

Q.      All right.  And at that point, did you get our [sic] of your pickup truck and look at the property or look at what you thought was the property?

A.      Yes.  Yes, I did.  Yes . . . .

Q.      Okay.  And how long were you outside of your truck looking around at the property?

A.      Five minutes maybe.  Maybe less.  It was pretty muddy.  I didn't go too far . . . .

Q.      And at some point . . . a man came up to you and asked you what he could do -- how he could help you, is that right?

A.      He asked me, I think, what I was doing there.

Q.      Okay.  And at that point you didn't introduce yourself, and he didn't introduce himself?

A.      No, I just asked him if he could help me, I was looking for this property and I was having a tough time finding any boundaries or anything.

Q.      And your testimony was that this conversation took place at a distance between you and . . . [Father], between 70 -- 75 and 50 feet?

A.      Yes.  Somewhere in there, yes.

Q.      Okay.  You were out of your truck and he was out of his house; is that right?

A.      He . . . came out of his house.  I was in the truck, we were talking.  I'm a little hard of hearing with the truck running, I shut the truck off, and I opened the door and got out of the truck and was standing on the street, and we were conversing back and forth.

Q.      And I believe your earlier testimony was you went there because you just wanted to have a look at the . . . [Family P]roperty, is that right?

- 24 -

A.      Yes.

. . .

Q.      And you told . . . [Father] that you were looking at the woods as part of a debt, and that you were thinking of harvesting the trees off of it, isn't that correct?

A.      I -- after a while, yes.  Because I didn't know who he was and I didn't want to say anything about my business or . . . [the Debtor] to somebody I didn't know.

Q.      So you knew him at that point to be –

A.      No, I --

Q.      -- . . . [F]ather at the time you told him that?

A.      I didn't know until after he identified himself.

Q.      All right.

A.      Then I told him.

Q.      And then you told him that you were thinking about harvesting the trees off her property, is that right?

A.      I was looking at ways I -- if I had the property, if I was looking to buy it, what I could do to refund some of my stuff, harvesting trees was an idea.

Q.      And so that's what [you] mentioned to him that you wanted to harvest all the trees off the property?

A.      Wasn't sure.  I just was -- it was one of the options I had.

Q       Okay.  And you were going to do that as part of collecting your debt, is that right? . . .

A.      . . . It was an idea.  I -- I can't say for sure if I was going to do it or not.

Q.      Okay.  So you were thinking of harvesting the trees?

A.      Yes.  Yes.  Absolutely, yes.

. . .

Q.      All right.  And your conversation with . . . [Father] agitated him very much, didn't it?

- 25 -

A.    He got agitated when talking about cutting the trees.

Q.    Yeah.  Okay.  Well, you knew that he was related to the Debtor, you knew that he was agitated about you suggesting harvesting all the trees to collect your debt.  Weren't you trying to communicate to the Debtor indirectly through her father?

A.    No, I had no idea who he was until he said who he was . . . .

(*See id.* at 10:25-14:13, 46:20-52:12 (Mr. Malicki's testimony).)

## III.  **COMPLAINT**

### A.    **Applicable Law**

Bankruptcy Code § 727(a) provides in relevant part as follows:

(a) The court shall grant the debtor a discharge, unless
. . .
(2) the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition; [or]

. . .

(4) the debtor knowingly and fraudulently, in or in connection with the case –

(A) made a false oath or account . . . .

11 U.S.C.A. § 727(a) (West 2011).  "[G]iven that the denial of a debtor's discharge 'imposes an extreme penalty for wrongdoing,' Section 727 'must be construed strictly against those who object to a debtor's discharge and liberally in favor of the . . . [debtor].'"  *Cadle Co. v. Ogalin (In re Ogalin),* 303 B.R. 552, 557 (Bankr. D. Conn. 2004) (Dabrowski, J.) (quoting *In re Chalasani*, 92 F.3d 1300, 1310 (2d Cir. 1996)).  The plaintiff in a proceeding under Section 727(a) must prove his case by a preponderance of the evidence.  *See Ogalin, supra* at 557; *see also* Fed. R. Bankr. P. 4005.  When proof

of the debtor's illicit intent is required as an element of the discharge objection, such proof may be made

by circumstantial evidence. *See, e.g., Georgen-Running v. Grimlie (In re Grimlie),* 439 B.R. 710, 717

(BAP 8th Cir. 2010); *Buckeye Retirement Co. LLC v. Swegan (In re Swegan),* 383 B.R. 646, 655 (BAP

6th Cir. 2008), *appeal dismissed,* 555 F.3d 510 (6th Cir. 2009).

### 1.    Bankruptcy Code § 727(a)(2)(B)

Mr. Malicki's claims and proof under Section 727(a)(2) rest entirely upon the Debtor's

postpetition conduct. The Complaint relies on Section 727(a)(2)(A). Post-petition conduct is within

the purview of Section 727(a)(2)(B), not Section 727(a)(2)(A). However, because no relevant objection

was made by the Debtor's counsel, the court will deem the Complaint to have been amended to conform

to the proof at the Trial pursuant to Rule 15(b)(2) of the Federal Rules of Civil Procedure (made

applicable to this proceeding pursuant to Rule 7015 of the Federal Rules of Bankruptcy Procedure).

To prevail under Section 727(a)(2)(B), "the plaintiff must prove that (1) the debtor,

(2) transferred or concealed, (3) property of the estate, (4) with the intent to hinder, delay or defraud a

creditor, (5) after the filing of the petition." *Adams v. Bostick (In re Bostick),* 400 B.R. 348, 356 (Bankr.

D. Conn. 2009).

### 2.    Bankruptcy Code § 727(a)(4)(A)

In order to deny discharge under Section 727(a)(4)(A), Mr. Malicki must establish by a

preponderance of the evidence that: (1) the debtor made the statement under oath; (2) the statement was

false; (3) the debtor knew that the statement was false; (4) the statement was made with fraudulent

intent; and (5) the statement related materially to the bankruptcy case. *Casa Investments Co. v. Brenes

(In re Brenes)*, 261 B.R. 322, 334 (Bankr. D. Conn. 2001) (Dabrowski, J.).[23] Omissions as well as

---

[23]    With respect to materiality to the bankruptcy case, this court accepts the following
formulation: "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it
bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets,

- 27 -

affirmative misstatements qualify as false statements for Section 727(a)(4)(A) purposes.  *Beaubouef v. Beaubouef* (*In re Beaubouef*), 966 F.2d 174, 178 (5th Cir. 1992).  Misstatements and omissions in the debtor's sworn bankruptcy schedules and/or in the debtor's sworn testimony at the debtor's Section 341 examination both are within the purview of Section 727(a)(4)(A).  *See, e.g., Moreo v. Rossi (In re Moreo),* 437 B.R. 40 (E.D.N.Y. 2010); *United States of America v. Argenti (In re Argenti),* 391 B.R. 671, 675 (Bankr. D. Conn. 2008) (Shiff, J.).

A statement is deemed to be made with knowledge of its falsity if it was known by the debtor to be false or if it was made with reckless disregard for the truth.  *D.A.N. Joint Venture, L.P. v. Cacioli* (*In re Cacioli*), 285 B.R. 778, 784 (Bankr. D. Conn. 2002) (Dabrowski, J.), *aff'd,* 332 B.R. 514 (D. Conn. 2005), *aff'd,* 463 F.3d 229 (2d Cir. 2006).  "[O]nce it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that [s]he has not committed the offense charged."  *Boroff v. Tully (In re Tully),* 818 F.2d 106, 110 (1st Cir. 1987) (internal quotation marks omitted).  Fraudulent intent may be inferred if the false statement is not explained satisfactorily.  *Montey Corp. v. Maletta (In re Maletta),* 159 B.R. 108, 112 (Bankr. D. Conn. 1993) (Shiff, J.).  However, the risk of nonpersuasion on the issue of fraudulent intent at all times remains with the plaintiff.  *See* Fed. R. Evid. 301.  *Cf. BTE Concrete Formwork, LLC v. Arbaney (In re Arbaney),* 345 B.R. 293, 301 (Bankr. D. Colo. 2006).  A false statement resulting from ignorance or non-reckless carelessness is not a statement that is knowing and fraudulent.  *See Sanderson v. Ptasinski (In re Ptasinski),* 290 B.R. 16, 23 (Bankr. W.D.N.Y. 2003) (court may find intent to deceive in a "reckless disregard of both the serious nature of the information sought and the necessary attention to detail and

---

business dealings, or the existence and disposition of his property." *Chalik v. Moorefield* (*In re Chalik*), 748 F.2d 616, 618 (11th Cir. 1984).

accuracy in answering" but not in mere ignorance or carelessness); *see also Diorio v. Kreisler-Borg Constr. Co.,* 407 F.2d 1330 (2d Cir. 1969).

**B.**     **Application of Law to Fact**[24]

**1.**     **Bankruptcy Code § 727(a)(4)(A)**

Mr. Malicki argues that the court should find that the Debtor intentionally failed to list the Debtor Interest on the Schedules (and intentionally failed to disclose the interest during the Examination) because she thought that there was no equity in the asset and also to avoid upsetting Father who was very attached to the Family Property.  It is true that a debtor's intentional failure to disclose an asset because the debtor believes it is of no value may support denial of discharge under Section 727(a)(4).  *See, e.g., Steibel v. Bressler (In re Bressler),* 387 B.R. 446, 461 (Bankr. S.D.N.Y. 2008) ("Bressler's discharge is denied in a large part because he essentially assumes a trustee's role of deciding what information is relevant or material, and thus undercuts the central principles of chapter 7, specifically the ability of a chapter 7 trustee to perform his or her duties.").  However, as discussed below, the court is not persuaded that the Debtor's failure to disclose the Debtor Interest on the Schedules or to the Trustee during the Examination was either knowing or fraudulent.

Mr. Malicki points to the Debtor's Rule 2004 Testimony as dispositive evidence that the Debtor intentionally failed timely to disclose the Debtor Interest in her bankruptcy.  At the Trial, the Debtor clarified her Rule 2004 Testimony as follows:  "I think the reason that I had forgotten . . . [the Debtor Interest] is because the value was inconsequential . . . .  [I]t didn't come into my mind . . . .  The reason it was not listed is because I had forgotten it."  (ECF No. 30 at 28:23-29:5 (Debtor's testimony).)[25]  The

---

[24]     For analytical reasons, the court first will consider denial of discharge under Bankruptcy Code § 727(a)(4)(A).

[25]     As noted in part II.A, *supra*, the actual value of the Debtor Interest is irrelevant to these proceedings.  However, the William Raveis BPO and the Warner Letter (and Father's testimony) lend

- 29 -

court credits that testimony standing on its own.  Further, the court credits the Debtor's testimony

describing the chaotic conditions existing around the time she filed the Petition, the Original Schedules

and the First Amendment.  Those conditions included that she had to summarize her entire financial

picture under trying circumstances from a bag of documents that (except, perhaps, for unilluminating

notices from Mr. Kaplan) did not contain any documents relating in any way to the Debtor Interest.[26]

It is true that the Debtor had remembered the Debtor Interest about eight months prior to filing the

Original Schedules and the First Amendment when she offered the Debtor Interest as collateral to Mr.

Kaplan.  However, it is understandable that the Debtor forgot the Debtor Interest in December, 2009

given the circumstances under which she prepared the Original Schedules and the First Amendment.[27]

There was nothing to trigger her recollection of the Debtor Interest thereafter until the Rule 2004

Subpoena.  Insofar as a motivation not to "upset" Father, it should be noted that the Debtor apparently

was not afraid to upset Father by including her debt to him in the Second Amendment.  Given the

circumstances here, the court concludes that the Debtor's explanation is sufficient to satisfy her burden

of production.  Taking into account all of the relevant facts and circumstances, the court is not

persuaded that the Debtor intentionally or recklessly failed to disclose the Debtor Interest in the

Schedules or at the Examination.

---

at least some credibility to the Debtor's testimony that she believed that the Debtor Interest was of
"inconsequential" value which, she testified, is why she "forgot[]" it when she prepared the Original
Schedules.

[26]      As noted above, at that time the Debtor did not have any documents relating to the
Debtor Interest or the Family Property except for the Kaplan notices.

[27]      Those same circumstances account for other inaccuracies in the Original Schedules
(noted in part II.A, *supra*) as well.  In fact, the Debtor was under such stress that she forgot to list Father
as a creditor.

### 2.   **Bankruptcy Code § 727(a)(2)(B)**

Based upon the analysis set forth in part III.B.1, *supra,* the court is not persuaded that the Debtor's failure to disclose the Debtor Interest was either knowing or fraudulent within the purview of Bankruptcy Code § 727(a)(2)(B).[28]

### C.   **Conclusion**

For all the reasons set forth above, the court concludes that a discharge should enter in this chapter 7 case.

## IV.   **COUNTERCLAIM**

### A.   **Applicable Law**

Bankruptcy Code § 362(a) provides in relevant part as follows: "[A] petition filed under section 301 . . . operates as a stay, applicable to all entities, of– . . .  (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title . . . ." 11 U.S.C.A. § 362(a)(6) (West 2011).[29]  Bankruptcy Code § 362(k)(1) provides in relevant part as follows: "[A]n individual injured by any willful violation of a stay provided by [Section 362(a)] . . . shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  11 U.S.C.A. § 362(k)(1) (West 2011).

---

[28]     The court has considered Mr. Malicki's remaining legal and factual arguments under Section 727(a)(2)(B) and/or 727(a)(4)(A) and finds them to be inapposite or otherwise unpersuasive.

[29]     The Debtor has not alluded to any specific subsection of Section 362(a).   Section 362(a)(6) is the obvious choice.  Section 362(a)(3) possibly also might be relevant.  However, given that the Debtor has not alluded to Bankruptcy Code § 362(a)(3), the court has not considered whether such additional potential basis for stay violation may be relevant.

Section 362(k)

does not impose damages for any violation of the automatic stay, but only those that are within its statutory definition, *i.e.,* "deliberate" actions that are "willful". §362(h);[30] *see also Crysen/Montenay Energy Co. v. Esselen Assoc., Inc.*, 902 F.2d 1098, 1105 (2d Cir. 1990); *Salem v. Paroli*, 260 B.R. 246, 257 (S.D.N.Y. 2001), *aff'd,* 79 Fed. Appx. 455, 456, 2003 WL 22440245 (2d Cir. 2003) (applying *Crysen, supra*, 902 F.2d at 1104) ("although we find that there was a violation of the automatic stay, we find neither willfulness nor malice in that action, and affirm [the] Judge['s] order [dismissing the adversary proceeding]"). Thus, the focus of this controversy is narrowed to whether, as *Crysen* holds, there was a "deliberate act taken . . . in violation of a stay, which [the creditor] kn[ew] to be in existence [that] justifies an award of actual damages". *Crysen, supra*, 902 F.2d at 1105.

*James v. Silver Ridge Condo. Ass'n, Inc. (In re James),* 367 B.R. 259, 262 (Bankr. D. Conn. 2007)

(Shiff, J.) (fifth and sixth alteration added).

As noted above, if an individual is injured by a willful violation of the automatic stay, she is entitled to "actual damages, including costs and attorneys' fees, and, in appropriate circumstances . . . punitive damages," 11 U.S.C.A. § 362(k) (West 2011).

When damages are sought under § 362 . . . [(k)] for violation of the automatic stay, the party seeking damages bears the burden of proof. *Lamar v. Mitsubishi Motors Credit of Am., Inc. (In re Lamar)*, 249 B.R. 822, 825 (Bankr. S.D. Ga. 2000) . . . . If the willful violation has a de minimis impact on the debtor, a court may limit damage awards under § 362 . . . [(k)] to reasonable attorney fees expended. *See In re Burrell* 1998 WL 411287 (Bankr. E.D. Va. 1998) at *6.

Punitive damages are authorized under § 362 . . . [(k)], but only in "appropriate circumstances." . . . *In re Ketelsen*, 880 F.2d 990, 993 (8th Cir. 1989).

*Roche v. Pep Boys, Inc. (In re Roche),* 361 B.R. 615, 624 (Bankr. N.D. Ga. 2005) (alteration added).

The general rule is that a debtor must show that she has suffered actual damages in order to recover punitive damages. *See, e.g., In re Prusan,* No. 09-49716-CEC, 2010 WL 813778, at *3 (Bankr. E.D.N.Y. Mar. 2, 2010); *In re Pulver-Thomas,* No. 04-10835, 2005 WL 1595727, at *1 (Bankr. D. Vt.

---

[30]        Subsection (h) of Section 362 was redesignated as subsection (k) by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. (*See* Pub. L. No. 109-8, § 305, 119 Stat. 23, 79 (2005).)

- 32 -

July 1, 2005).[31]  However, if the violation manifested an arrogant defiance of federal law, courts have assessed punitive damages without regard to any harm suffered by the debtor at least under certain circumstances.  *See In re Roche, supra* at 624 (so noting).

### B.    Application of Law to Fact

### 1.    The Malicki Telephone Call

Based upon the record set forth above, the court finds and/or concludes that the Malicki Telephone Call constituted a "wilful violation of . . . [the automatic] stay" within the purview of Section 362(k).  However, the Debtor admits that she suffered no monetary damages as a result of the Malicki Telephone Call (*see* ECF No. 30 at 58-59 (Debtor's testimony)), and that "[i]t just added to . . . [the] anxiety that . . . [she] was already experiencing," (*id.* at 59:3-4 (Debtor's testimony).)  Moreover, the Debtor has submitted no proof of attorneys' fees incurred by her either with respect to the Lenz Letter or with respect to the filing and prosecution of the Counterclaim.  Based upon the entire record, the court is not persuaded that the Malicki Telephone Call had more than a *de minimis* impact on the Debtor.  Moreover, no relevant attorneys' fees have been proved.  Accordingly, the court awards no actual damages.  Further, the court finds insufficient additional circumstances to warrant an award of punitive damages in the absence of an award of actual damages.

### 2.    The Malicki Visit

The Debtor argues that the Malicki Visit was intended by Mr. Malicki to put pressure on the Debtor indirectly through Father.  Based upon the entire record, the court is not persuaded that such was

---

[31]    Courts are in disagreement as to whether attorneys' fees incurred in prosecuting the Section 362(k) motion are included in "actual damages."  *Compare Sternberg v. Johnston,* 595 F.3d 937 (9th Cir.), *cert. denied,* 131 S.Ct. 102, 180 (2010) (not included) *with In re Grine,* 439 B.R. 461 (Bankr. N.D. Ohio 2010) (included).

- 33 -

the case.  Accordingly, the court is not persuaded that the Malicki Visit constituted a "willful violation of . . . [the automatic] stay" within the purview of Section 362(k).

      **C.**      **Conclusion**

For the reasons set forth above, the court concludes that the Debtor should take nothing on the Counterclaim.

**V.**      **CONCLUSION**

For the reasons set forth above, judgment shall enter (a) for the Debtor on the Amended Complaint, determining that discharge shall enter in this chapter 7 case, and (b) for Mr. Malicki on the Counterclaim, ordering that the Debtor shall take nothing on the Counterclaim.

      It is **SO ORDERED.**

Dated: April 18, 2011                        BY THE COURT

                                     **Lorraine Murphy Weil**
                               **Chief United States Bankruptcy Judge**